## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                            Case No.  3:05-cr-64-J-32MMH

EMORY CLAYTON RICE, JR.
_____/

### REPORT AND RECOMMENDATION[1]

      This cause is before the Court on Defendant's Motion to Suppress Statements (Dkt.

No. 57; Motion to Suppress), which was filed on June 27, 2005.  The government opposes

the Motion to Suppress.  See United States' Response in Opposition to Defendant's Motion

to Suppress (Dkt. No. 62; Opposition), filed on July 12, 2005.  The undersigned held an

evidentiary hearing on July 14, 2005.  See Transcript of Defendant's Hearing on Motion to

Suppress (Dkt. No. 77; Tr.).  At the conclusion of the evidentiary hearing, the Court granted

Defendant's request that the parties file supplemental memoranda and written closing

arguments.  See Order (Dkt. No. 67); Order (Dkt. No. 76).  Therefore, on August 4, 2005,

the parties filed their supplemental memoranda.  See Closing Argument and Memorandum

of Law (Dkt. No. 79; Defendant's Memorandum); United States' Amended Supplemental

Memorandum of Law (Dkt. No. 80; Government's Memorandum).  Accordingly, the Motion

to Suppress is now fully briefed and ripe for resolution.

---

[1]      Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

## I.      Evidence and Testimony

At the evidentiary hearing, the following three witnesses testified: Inspector Larry E. King,[2] Inspector Tom Curto,[3] and Defendant Emory Clayton Rice, Jr.[4]  <u>See</u> Tr. at 5, 41, 61, 85.

From 1990 to January 2005, Defendant was employed as a mail processor by the United States Postal Service.  <u>See</u> <u>id.</u> at 63.  In this position, he was primarily responsible for the operation of a mail processing machine.[5]  <u>See</u> <u>id.</u>  Defendant was assigned to the third shift (10:00 p.m. to 6:30 a.m.) at the main post office located on Kings Road.  <u>See</u> <u>id.</u> at 63-64.  Prior to March 29, 2005, Defendant had abused alcohol and crack cocaine for fifteen years.  <u>See</u> <u>id.</u> at 64-65.  He testified that he used crack cocaine all day and every day.  <u>See</u> <u>id.</u> at 65, 76.

On December 19, 2004, Defendant reported for work at 8:00 p.m. because his supervisor asked him to come to work early.  <u>See</u> <u>id.</u> at 66, 76.  Prior to going to work that day, Defendant had consumed a couple of beers and had used crack cocaine "[p]retty

---

[2]      Inspector King is employed as a postal inspector with the United States Postal Inspection Service and has been so employed for sixteen and a half years.  <u>See</u> Tr. at 6, 19-20, 21.

[3]      Inspector Curto is also employed as a postal inspector with the United States Postal Inspection Service and has been so employed for approximately thirteen and a half years.  <u>See</u> Tr. at 41-42, 45.  He has been employed by the United States Post Office for more than twenty-six years.  <u>See</u> <u>id.</u> at 46.

[4]      Defendant enlisted in the Air Force in 1970 and was discharged in 1986.  <u>See</u> Tr. at 62.  While in the Air Force, he served as a security police officer.  <u>See</u> <u>id.</u> at 61.  From 1986 to 1990, he worked as a private security guard.  <u>See</u> <u>id.</u> at 62-63.  Defendant was hired by the United States Postal Service in 1990.  <u>See</u> <u>id.</u> at 63.

[5]      A mail processing machine reads the bar code on each piece of mail and sorts it so that it can be routed to the appropriate carrier for delivery.  <u>See</u> Tr. at 7, 63.

much all day," but could not recall a specific amount.  Id. at 65-66.  Defendant testified that

when he arrived at work, he was under the influence of crack cocaine and alcohol.  See id.

at 66.[6]

Inspector King had received information from a Postal Service manager, describing

Defendant as a crackhead or cocaine addict and indicating that Defendant might be

opening mail.  See id. at 13, 42-43.  Therefore, Inspectors King and Curto also arrived at

the facility on Kings Road around 8:00 p.m. on December 19, 2004, in order to observe

Defendant and investigate the allegations.  See id. at 6, 24-25, 42-43, 48.  The inspectors

watched Defendant from the lookout gallery until around 11:00 p.m.[7]  See id. at 7, 25, 43,

49.  They were unable to observe him constantly for the three-hour period, because

Defendant left the area intermittently.  See id. at 24-25, 49-51.  However, while observing

him, they saw Defendant open approximately one to two dozen pieces of mail.  See id. at

7.  Inspector King recalled that Defendant appeared to be acting normally and performed

his job in a routine and ordinary manner, except for opening the mail.  See id.  Similarly,

Inspector Curto testified that Defendant was able to perform his job duties and did not

appear to be under the influence of crack cocaine.  See id. at 43.

At around 11:00 p.m., Inspector King approached Defendant, identified himself, and

handcuffed Defendant.  See id. at 8, 26-27, 85.  He did not explain to Defendant why he

---

[6]    On the other hand, both Inspector King and Inspector Curto testified that Defendant did not appear to be under the influence of drugs or alcohol and recalled that Defendant denied using any drugs on that night.  See Tr. at 7, 12-14, 17, 43-45, 55.

[7]    The lookout gallery is an enclosed catwalk system with one-way mirrors, which can be used to observe the workroom floor.  See Tr. at 6, 24, 48-49.

was detaining him.  See id. at 27.  Inspector Curto joined him shortly thereafter and identified himself.[8]  See id. at 8, 26, 52.  Defendant remained handcuffed for about ten to fifteen minutes.  See id. at 8.  During this time, the inspectors gathered up certain pieces of mail at Defendant's station and escorted him to an interview room on the second floor. See id. at 8-9, 27-28, 52.  Once they arrived at the interview room, Inspector King searched Defendant, removed the handcuffs, and invited him to sit down.  See id. at 9, 26, 29, 53, 67.  Defendant recalled that it was at this time that the inspectors introduced themselves.[9] See id. at 68.  The inspectors did not find any weapons, drugs, or drug paraphernalia on Defendant or at his work station.  See id. at 9; see also id. at 53.

After removing the handcuffs, Inspector King read Defendant his Miranda[10] rights. See id. at 10, 32, 44, 54.  Inspector King testified that Defendant then asked whether he needed a union steward or attorney present.  See id. at 10, 33, 54.  Defendant asserted that he actually requested that a union steward be present during the questioning.[11]  See id. at 70.  Inspector King recalled that he told Defendant in response to his question that it "was his decision to make, if he . . . wished to have that."  Id. at 10; see also id. at 55. He advised Defendant that he was not under arrest and was free to leave and explained

---

[8]     Defendant testified that both inspectors approached him at the same time, it was unexpected and he did not know why he was being handcuffed, and that the individual who handcuffed him did not introduce himself.  See Tr. at 66-67.

[9]     Defendant also testified that he thought the inspectors were part of management. See Tr. at 79-81.

[10]     Miranda v. Arizona, 384 U.S. 436 (1966).

[11]     Defendant did not recall Inspector King's response.  See Tr. at 70.

that they only wanted to conduct an interview.[12]  See id. at 10-11, 34, 44, 54.  He also informed Defendant that they were merely fact finders and that they would be reporting the results of their investigation and the interview to the United States Attorney and postal management.  See id. at 11, 18.  Inspector King told Defendant that the United States Attorney would decide whether any charges would be filed and that postal management would determine his job status.  See id.  He advised Defendant that they "had no say one way or the other over . . . either his arrest status or his job status."  Id. at 18.

Defendant decided "that he would go ahead and talk to [the inspectors] for at least a while without having [some]one present."  Id. at 10.  According to Inspector King, Defendant said words similar to:  "'I'll talk to you for a little while, and if I want to stop, I'll stop.'"  Id.  Defendant did not attempt to terminate the interview at any time.  See id. at 12, 44-45.  Inspectors King and Curto recalled that Defendant appeared to understand his rights.  See id. at 11-12, 44.  Indeed, Defendant told Inspector King that he understood his rights.  See id. at 35.  Defendant signed the section of the waiver form indicating that he understood his rights as well as the section indicating that he wanted to waive his rights.  See id. at 12; Government's Ex. 1.  While Defendant did not specifically recall signing the waiver form, see Tr. at 68-69, 79, he conceded that he must have signed the form even though the signature on the form was not his usual signature.  See id. at 69-70.  He did remember being advised of his Miranda rights on that night.  See id. at 78-79.

---

[12]      Inspector King failed to note in his report that he told Defendant he was free to leave.  See Tr. at 34-35.

After Defendant executed the Waiver of Rights form, the inspectors informed Defendant that they wanted to talk to him about what they had observed regarding his work activities.  See id. at 9, 13, 32; see also id. at 68.  Inspector King explained to Defendant that they saw him opening several pieces of mail during the evening.  See id. at 13.  At first, Defendant stated that he did not recall opening any mail.  See id. at 13.  At that point, Inspector King asked Defendant if he was under the influence of any substance that would have affected his memory.  See id.  Defendant responded that he was not under the influence of any drugs.  See id. at 13, 55, 73.  He later indicated that he had been arrested previously for cocaine use or possession and was still undergoing treatment.  See id. at 14.  He denied that opening the mail had any connection to his cocaine addiction.  See id.  Defendant now suggests that he was still under the influence of crack cocaine and alcohol at the time of this interview and testified that he recalled feeling stressed, nervous, and uptight during this meeting.  See id. 69-70, 75, 79.  While Defendant was nervous, the inspectors both reported that he did not appear to be under the influence of drugs or alcohol.  See id. at 12, 17, 36, 44.  Indeed, his statements were lucid and coherent.  See id. at 14, 17-18, 45.

Upon further questioning regarding his activities, Defendant admitted that he had opened and looked inside envelopes where the flaps were not sealed and that he had opened envelopes that were damaged or torn.  See id. at 14-15.  Defendant then stated that he opened mail that he thought contained items that would jam the machine.  See id. at 16.  However, he admitted that he knew employees were not permitted to open mail to search for such items.  See id.  Finally, Inspector King told Defendant that he had

videotaped him opening several pieces of mail.  <u>See</u> <u>id.</u>  Defendant responded by stating words similar to: "'If you have me on video, I guess I did it.'"  <u>Id.</u>

The interview lasted approximately thirty minutes during which the inspectors discussed the activities that they had observed.  <u>See</u> <u>id.</u> at 18.  After that portion of the interview concluded, Inspector King asked Defendant to provide some personal information, such as his address and next of kin.  <u>See</u> <u>id.</u>  Then, Inspector King asked Defendant to provide his fingerprints and Defendant declined by stating, "'Well, if I'm not under arrest, I'm not going to let you take my fingerprints.'"  <u>Id.</u>  When their conversation ended, Defendant asked Inspector King if he could return to work and Inspector King informed Defendant that the decision would be made by his supervisors.  <u>See</u> <u>id.</u> at 18-19.

Following their conversation with Defendant, the inspectors met with Defendant's supervisors.  <u>See</u> <u>id.</u> at 56.  They informed the managers of some of the statements that Defendant made during the interview, including the admissions made regarding opening the mail.  <u>See</u> <u>id.</u>  The inspectors later learned that Defendant's supervisors suspended him.  <u>See</u> <u>id.</u> at 19, 56.

Defendant, on the other hand, indicated that he met with his supervisor and union steward after talking with the inspectors.  <u>See</u> <u>id.</u> at 74.  According to Defendant, his supervisor, union steward, and one of the inspectors escorted him to his locker and asked him to empty it.  <u>See</u> <u>id.</u>  He recalled that at this time the union steward did not have any information regarding the situation and Defendant could not remember what his supervisor said to him.  <u>See</u> <u>id.</u>  Ultimately, the union steward took Defendant home that night around 1:00 a.m.  <u>See</u> <u>id.</u>  Despite being unable to recall what his supervisor said to him,

Defendant stated that no one informed him that he was suspended until the union steward told him on the way home.  See id. at 74-75.

## II.    Summary of Argument

Defendant contends that his statements were coerced in violation of the Fifth Amendment based on the implicit threat that he would lose his job if he invoked his rights and refused to talk to the inspectors.  See Motion to Suppress at 1, 3; Defendant's Memorandum at 1-2.  Alternatively, Defendant asserts that he did not knowingly and intelligently waive his Fifth Amendment rights because he was under the influence of crack cocaine and alcohol.  See Motion to Suppress at 3-4; Defendant's Memorandum at 10.

The government alleges that Defendant's subjective belief that he would lose his job if he invoked his Fifth Amendment rights was not objectively reasonable.  See Opposition at 3-5; Government's Memorandum at 4-6.  In addition, it maintains that Defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment rights and Defendant's alleged alcohol and drug use does not invalidate that waiver.  See Opposition at 6-7; Government's Memorandum at 7.

## III.   Discussion[13]

The Fifth Amendment guarantees, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V; see also

---

[13]    While there are some discrepancies between the testimony of all three witnesses, the undersigned does not need to reconcile those inconsistencies or make a credibility determination in order to resolve the Motion to Suppress.

-8-

Minnesota v. Murphy, 465 U.S. 420, 426 (1984).[14]  The Fifth Amendment privilege is not self-executing and generally the individual must assert it in order to enjoy the protection. See Murphy, 465 U.S. at 429; United States v. Vangates, 287 F.3d 1315, 1320 (11th Cir. 2002).   However, the United States Supreme Court has recognized the following two exceptions: (1) the individual is in police custody or (2) "the assertion of the privilege is penalized."  Murphy, 465 U.S. at 429, 434; see also Vangates, 287 F.3d at 1320.

The Fifth Amendment is automatically invoked when an individual is in police custody unless that individual voluntarily, knowingly, and intelligently waives his or her rights.  See Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (plurality opinion); Murphy, 465 U.S. at 429-30.  Similarly, a public employee is protected by the Fifth Amendment, despite his or her failure to invoke it explicitly, when he or she is threatened with discharge from employment and compelled to make an incriminating statement.  See Murphy, 465 U.S. at 434-35; Vangates, 287 F.3d at 1320.  Thus, statements made in this latter situation cannot be used against the individual in subsequent criminal proceedings.  See Vangates, 287 F.3d at 1320-21.  Defendant argues that both of these exceptions are applicable in this case to excuse his failure to invoke the Fifth Amendment.  See Motion to Suppress at 1-3; Defendant's Memorandum at 1, 9-10.

---

[14]     The United States Supreme Court has also recognized that the admission of coerced statements violates the Due Process Clause of the Fourteenth Amendment.  See Colorado v. Connelly, 479 U.S. 157, 163-65 (1986).

**A.      Whether Defendant's Statements Were Coerced by an Implicit Threat of Removal upon the Invocation of His Fifth Amendment Rights**

Defendant argues that he had a subjective belief that if he asserted his right to remain silent and did not answer the inspectors' questions on December 19, 2004, he would have been suspended or removed from his position at the United States Postal Service. See Defendant's Memorandum at 1-2. Thus, Defendant suggests that his incriminating statements should be suppressed pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967). See id. at 1-4; see also Motion to Suppress at 1-3. Defendant concedes that there was no direct threat of removal. See Defendant's Memorandum at 1-2. However, he asserts that his belief was objectively reasonable. See id. at 1-3. The government, on the other hand, contends that there was no state action to support Defendant's subjective belief. See Government's Memorandum at 4-6.

As indicated supra, both the Fifth and Fourteenth Amendments preclude the admission of coerced statements. See Colorado v. Connelly, 479 U.S. 157, 163-65 (1986); Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988). The coercion may be either physical or mental. See Garrity, 385 U.S. at 496. Indeed, the United States Supreme Court has recognized that "[s]ubtle pressures may be as telling as coarse and vulgar ones." Id. (citations omitted). In Garrity, the Supreme Court found "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." Id. at 500. The Court reasoned that "policemen, like teachers and lawyers, are not relegated to

a watered-down version of constitutional rights." Id.   However, the rule established in "Garrity is limited to instances where an interviewee is coerced into waiving his constitutional right against self-incrimination through the threat of dismissal." United States v. Camacho, 739 F. Supp. 1504, 1514 (S.D. Fla. 1990).

While the threat of removal need not be direct to establish coercion, courts have suggested that Garrity is more easily applied to those situations.  See Vangates, 287 F.3d at 1321; Camacho, 739 F. Supp. at 1515, 1520.  When there is no direct threat of removal, as there was in Garrity, 385 U.S. at 494, the defendant must show the following in order to establish coercion:

>  (1)   "he subjectively believed that he would lose his job if he refused to answer questions" and
>
>  (2)   "his belief was objectively reasonable."

United States v. Waldon, 363 F.3d 1103, 1112 (11th Cir. 2004) (per curiam), cert. denied, 125 S. Ct. 208 (2004) (mem.); see also Vangates, 287 F.3d at 1322; United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988).  In order for a defendant's belief to be objectively reasonable, it must be "derived from actions of the governmental unit." Waldon, 363 F.3d at 1112; see also Vangates, 287 F.3d at 1323-24 (requiring a showing of state action in order to find the defendant's belief was objectively reasonable).  "A subjective belief that Garrity applies will not be considered objectively reasonable if the state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment." Camacho, 739 F. Supp. at 1515.  In addition, the court

must consider the totality of the circumstances in determining whether an implicit threat was made.  See Vangates, 287 F.3d at 1322; Camacho, 739 F. Supp. at 1515.

An employee's subjective belief is not objectively reasonable when the only state action is a "general directive to cooperate," because it is "not sufficiently coercive to create an objectively reasonable belief that [the employee] would be sanctioned if [he or she] invoked [his or her] Fifth Amendment rights."  Vangates, 287 F.3d at 1324.  Similarly, a general expectation that the employee will testify is insufficient to establish coercion.  See Benjamin v. City of Montgomery, 785 F.2d 959, 962 (11th Cir. 1986).  "[I]n order to be coercive for Fifth Amendment purposes, the statute must be applied to punish an employee for invoking the Fifth Amendment."  Camacho, 739 F. Supp. at 1517.[15]  On the other hand, at least one court has found an implicit threat of removal and a violation of the Fifth Amendment when the employee was commanded to answer questions, he was warned that the answers could be used against him in a criminal prosecution, and he was fired when he invoked his Fifth Amendment rights.  See Arrington v. County of Dallas, 970 F.2d 1441, 1446 (5th Cir. 1992).

The immunity created in Garrity is self-executing and the employer is not required to provide a specific grant of use immunity when statements are compelled upon threat of discharge.  See Vangates, 287 F.3d at 1321; United States v. Veal, 153 F.3d 1233, 1239 n.4 (11th Cir. 1998); Benjamin, 785 F.2d at 961.  Suppression is warranted based on

_____

[15]     Moreover, the mere existence of a departmental policy providing for removal when an employee invokes his or her right to remain silent may not establish that the employee's subjective belief was objectively reasonable.  See Camacho, 739 F. Supp. at 1516; see also Benjamin, 785 F.2d at 962 n.1.

Garrity when the employee has been compelled to answer incriminating questions upon threat of dismissal and the employer has refused to provide immunity from prosecution based on the answers.  See Harrison v. Wille, 132 F.3d 679, 682 (11th Cir. 1998) (per curiam); Arrington, 970 F.2d at 1446.  The employer's explicit or implicit threat of dismissal must be based solely on the employee's invocation of his or her Fifth Amendment rights. See Harrison, 132 F.3d at 682; see also Dwan v. City of Boston, 329 F.3d 275, 279-81 (1st Cir. 2003).  However, if an individual, who has been compelled to make a statement under a threat of dismissal, makes a false statement, instead of invoking his or her right to remain silent, that statement is not protected by the Fifth Amendment.  See Waldon, 363 F.3d at 1112; Veal, 153 F.3d at 1241-43.

In this case, Defendant contends that he was implicitly threatened with removal if he did not answer the inspector's questions.  See Tr. at 73, 75, 80-81; Defendant's Memorandum at 1-2.  While there may be some doubt, see, e.g., Tr. at 71, 79-80 (indicating that Defendant may have feared termination based on previous incidents of misconduct), the undersigned finds that the record adequately establishes that Defendant had a subjective belief that if he invoked his Fifth Amendment rights, he would be terminated, see id. at 73, 75, 80-81.  Defendant argues in his Memorandum that this subjective belief was objectively reasonable for the following three reasons:  (1) the inspectors told him that they would be reporting their conversation to management and management would decide whether he would remain employed; (2) Defendant was actually suspended after the interview; and (3) the employee manual and regulations, which require

-13-

cooperation with investigators, establish that if Defendant had invoked his right to remain silent, he would have been terminated.  <u>See</u> Defendant's Memorandum at 1-3.

At the beginning of the interview, Inspector King informed Defendant of his Fifth Amendment rights and notified him that any statements he made would be used against him in any subsequent criminal prosecution.  <u>See</u> Tr. at 10-11.  Thus, at that moment, it was evident that the inspectors were not providing Defendant with immunity from prosecution.  On the other hand, the inspectors did not make any statements that could be interpreted as commanding Defendant to answer their questions or face dismissal.  They never told Defendant or suggested to him that his job was in jeopardy if he refused to answer their questions.  <u>See</u> <u>id.</u> at 19, 45, 79.  Instead, Inspector King informed Defendant that he did not have to make any statements.  <u>See</u> <u>id.</u> at 10.  In addition, he informed Defendant that they would not be making any decisions regarding his employment status, but they would inform Defendant's supervisors of the results of the interview.  <u>See</u> <u>id.</u> at 11.

The fact that the inspectors informed Defendant that they would be advising postal management of the results of their interview and investigation does not support a reasonable belief that Defendant would be removed for failing to answer their questions.  <u>See</u> <u>id.</u> at 11, 18.  The inspectors did not suggest to Defendant that his cooperation would have a favorable impact on management's ultimate decision or that there would be negative consequences for an unfavorable report.  <u>See</u> <u>id.</u> at 11, 18-19.  Indeed, when Defendant directly asked if he could return to work at the conclusion of the interview and after he confessed, the inspectors merely informed him that the decision would be made

by the supervisors. See id. at 18-19. Therefore, the fact that the inspectors informed Defendant that they would be reporting the details of the interview and investigation to postal management, who would make a decision regarding Defendant's job status, does not establish that Defendant's subjective belief was objectively reasonable. There was no indication as to the consequences of such a report or what information the supervisors would use as the basis for their ultimate decision.

Likewise, the fact that Defendant was subsequently suspended by his supervisors after the interview and the inspectors' verbal report to management does not establish that Defendant's belief was objectively reasonable. In order to warrant suppression, the sole reason for the adverse action must be Defendant's invocation of his Fifth Amendment rights. See Harrison, 132 F.3d at 682. In this case, Defendant answered the inspectors' questions and did not invoke his Fifth Amendment rights. Thus, his subsequent suspension does not support an objective belief that he would have been removed if he had invoked his right to remain silent. Moreover, it is uncertain why Defendant was suspended on that night. He admitted during the evidentiary hearing that his supervisor had already started the process of removal based on a previous incident of misconduct. See Tr. at 72-73. In addition, Defendant had admitted to opening mail, see id. at 14-16, and the inspectors apparently had videotaped these activities. See id. at 16, 50. Therefore, this case is unlike the situation presented in Arrington, where the court concluded that there was an implicit threat based, in part, on the fact that Defendant was terminated after invoking his Fifth Amendment rights. See 970 F.2d at 1446.

Finally, Defendant's reliance on certain provisions in the Postal Employee and Labor Relations Manual (ELM) and the federal regulations does not establish that Defendant's belief was objectively reasonable.  First, Defendant asserts that the relevant federal regulations require employees to cooperate with audits, reviews, and investigations of the Office of Inspector General.  See Defendant's Memorandum at 3.  Specifically, Defendant relies on 39 C.F.R. § 230.3(a).  See id.  However, this investigation was not conducted by the Office of Inspector General.  Both Inspector King and Inspector Curto testified that the Postal Inspection Service is separate from the Inspector General's Office.  See Tr. at 21, 46-47.  The fact that the Office of Inspector General has oversight authority over the Postal Inspection Service does not convert the inspectors' actions into an investigation by that office.  Accordingly, the undersigned finds that this regulation is not applicable.

More importantly, even if this regulation were applicable, it does not establish that Defendant's belief was reasonable.  This regulation is similar to the requirement in the ELM that states, "Employees will cooperate in any postal investigation."  Defendant's Ex. 1.  The ELM also provides that "Postal officials will take appropriate disciplinary measures to correct violations of these requirements."  Id.  However, these directives are not sufficient to establish that an employee will be terminated if that employee invokes his or her Fifth Amendment rights.  Indeed, other courts have found language similar to that in the applicable ELM is not sufficient to establish an implicit threat of removal.  See Terry v. United States, 499 F.2d 695, 699-700 (Ct. Cl. 1974); United States v. Puntigam, No. 97 CR. 857(BSJ), 1997 WL 811528, at *2 (S.D.N.Y. Oct. 28, 1997).  In Terry, the court interpreted very similar language and held that the regulations requiring cooperation "do

not purport to abrogate the constitutional privilege of each employee to refuse to give incriminating testimony against himself."  499 F.2d at 700.  Furthermore, the court in Puntigam interpreted the same language that is at issue in this case and found that "no credible reading of that rule could lead to the conclusion that it threatened such an 'economic catastrophe' as to force a waiver of defendant's Fifth Amendment rights."  1997 WL 811528, at *2 (citation omitted).

Other courts have also concluded that regulations documenting an expectation that the employee will cooperate or testify are insufficient to establish an implicit threat of removal.  See, e.g., Vangates, 287 F.3d at 1324; Benjamin,785 F.2d at 962.  Indeed, in Waldon, the Eleventh Circuit concluded that the defendant's belief that he would be removed was unreasonable when the only support for his position was a regulation evidencing a general expectation of cooperation and a "Municipal Code requirement that the city reserves the right to discipline employees exercising their Fifth Amendment privilege."  363 F.3d at 1112.

Thus, the statements in the ELM and the federal regulations are insufficient to establish an implicit threat.  There is no indication that these provisions have been applied to sanction an employee for invoking his or her Fifth Amendment rights.  Inspector King testified that he had interviewed employees in the past who refused to answer questions, he reported their invocations of the Fifth Amendment to management along with the other information uncovered, and some of the employees were subsequently fired.  See Tr. at 22.  However, there was no testimony that the reason for the termination of those employees was due to the invocation of the Fifth Amendment.  See id.   In addition,

Inspector King opined that the cooperation requirement in the ELM did not require an employee to admit wrongdoing. <u>See</u> <u>id.</u> at 39. As recognized in <u>Terry</u>, these provisions "do not state or suggest that the duty to cooperate is absolute and unqualified at all times and in all circumstances. . . . [and] they do not require employees to disclose all information in their possession which pertains to postal matters under investigation." 499 F.2d at 700.

Therefore, Defendant's subjective belief that he would be terminated if he refused to answer the inspector's questions was not based on any governmental action and was not objectively reasonable. Accordingly, the undersigned finds that Defendant's statements were not coerced by an implicit threat of removal.

### B. Whether Defendant Properly Waived His Fifth Amendment Rights[16]

Defendant argues that he did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights because he was under the influence of crack cocaine and alcohol. <u>See</u> Motion to Suppress at 3-4; Defendant's Memorandum at 9-10. Thus, Defendant claims that the verbal waiver given and written waiver executed on December 19, 2004, were invalid. <u>See</u> Motion to Suppress at 4; Defendant's Memorandum at 9. The government contends that Defendant was not under the influence of drugs or alcohol on that night and, even if he was, he knowingly, intelligently, and voluntarily waived his rights. <u>See</u> Opposition at 6-7; Government's Memorandum at 7.

---

[16] In its Opposition and Memorandum, the government strenuously argues that Defendant was not in custody and therefore Inspector King was not required to advise him of his rights. <u>See</u> Opposition at 5-6; Government's Memorandum at 2-4, 6. However, the undersigned need not decide this difficult question because even if Defendant were in custody, he knowingly, intelligently, and voluntarily waived his rights. Accordingly, for the purposes of this Report and Recommendation, the undersigned assumes that Defendant was in custody.

While a defendant may waive his Fifth Amendment rights, such a waiver must be made voluntarily, knowingly, and intelligently.  See Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Muniz, 496 U.S. at 589.  Specifically, an effective waiver requires the following:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran, 475 U.S. at 421; see also Hart v. Attorney Gen. of Fla., 323 F.3d 884, 892 (11th Cir. 2003), cert. denied, 540 U.S. 1069 (2003) (mem.); United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995).  The officer, however, is not required to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."  Moran, 475 U.S. at 422.

The United States Supreme Court has concluded that a "waiver is valid as a matter of law," "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction."  Id. at 422-23.  The government bears the burden of proving by a preponderance of the evidence that a defendant voluntarily, knowingly, and intelligently waived his rights.  See Connelly, 479 U.S. at 168; Coleman v. Singletary, 30 F.3d 1420, 1426 (11th Cir. 1994); United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998), aff'd, 204 F.3d 1120 (11th Cir.

1999) (unpublished table decision).  This waiver can be explicit, but also can be implied

from a defendant's actions.  See United States v. Chong, 829 F.2d 1572, 1574 (11th Cir.

1987).[17]

　　　In determining whether Defendant effectively waived his rights, the Court first

considers whether Defendant made a voluntary waiver.  The Eleventh Circuit in Barbour

found that the defendant's waiver was voluntary when there was no "evidence

of psychological or physical coercion on the part of the agents."  70 F.3d at 585; see also

Smith v. Zant, 887 F.2d 1407, 1427-28 (11th Cir. 1989) (Kravitch, J., concurring, in part,

and dissenting, in part).  In this case, as explained supra, there is no evidence of coercion.

Defendant does not argue that the statements were a product of coercion, other than the

argument made pursuant to Garrity.  Having concluded that the statements were not

coerced by an implicit or explicit threat of removal from his job, there is no evidence in the

record to support a finding of coercion.

　　　Defendant argues that the waiver was involuntary because he was under the

influence of crack cocaine and alcohol.  See Motion to Suppress at 3-4; Defendant's

Memorandum at 9-10.  However, the United States Supreme Court has held that in order

for a statement to be involuntary under the Fifth or Fourteenth Amendment, it must be a

result of coercive police activity.  See Connelly, 479 U.S. at 167, 169-70; see also Miller,

---

[17]　　　For example, if, after being advised of his rights, a defendant responds to questions posed by a law enforcement officer without requesting an attorney, a "waiver may be implied." Chong, 829 F.2d at 1574.  In this case, there is an express waiver as Defendant agreed to answer questions and signed a written waiver.  See Tr. at 10; Government's Ex. 1.

-20-

838 F.2d at 1538.   There is no indication in the record that the inspectors knew of Defendant's intoxicated condition, but even if they did, the testimony does not suggest that they took advantage of his allegedly altered state of mind.  See id. at 1537 (acknowledging that "Connelly makes clear that even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless '[t]he police exploited this weakness with coercive tactics'" (emphasis in original) (quoting Connelly, 479 U.S. at 521)).   Therefore, as the inspectors did not coerce Defendant into making these statements, Defendant's waiver was not involuntary due to his alleged drug use.

Next, the Court evaluates whether Defendant knowingly and intelligently waived his rights.  In order to make that determination, the Court should again consider the totality of the circumstances as well as certain factors, such as the defendant's age, experience, education, background, intelligence, and language ability.  See Coleman, 30 F.3d at 1426; United States v. Gaddy, 894 F.2d 1307, 1312 (11th Cir. 1990); Miller, 838 F.2d at 1539; Brown v. Crosby, 249 F. Supp. 2d 1285, 1292 (S.D. Fla. 2003); Nuyens, 17 F. Supp. 2d at 1307.   The Eleventh Circuit has also recognized that "mental illness[, including drug addiction,] is . . . a factor to be weighed in determining the validity of a waiver." Gaddy, 894 F.2d at 1312; see also Coleman, 30 F.3d at 1426.  Moreover, an express waiver of rights, whether written or oral, is another factor and is usually strong but not conclusive proof that the waiver was knowingly, intelligently, and voluntarily executed.  See Hart, 323 F.3d at 893; Brown, 249 F. Supp. 2d at 1301.

"If a defendant cannot understand the nature of his rights, he cannot waive them intelligently." Miller, 838 F.2d at 1539.  However, "[the] defendant need not understand all the complexities of his fifth amendment rights and [all] of the implications of a decision to waive those rights.   Rather, the defendant must understand only the core of the fifth amendment guarantee." Smith, 887 F.2d at 1430 (Kravitch, J., concurring, in part, and dissenting, in part); see also Gaddy, 894 F.2d at 1312 (finding that "[a] criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made").  Thus, a waiver "is 'knowingly and intelligently' made if it is 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" Brown, 249 F. Supp. 2d at 1291 (quoting Moran, 475 U.S. at 421).

Defendant contends that he was under the influence of crack cocaine and alcohol at the time of the interrogation and had been addicted to crack cocaine and alcohol for at least fifteen years.  See Defendant's Memorandum at 10.  According to Defendant, his intoxicated state precluded him from knowingly and intelligently waiving his Fifth Amendment rights.  See id.  As evidence of his intoxicated state, he points to the fact that the signature on the waiver form was irregular and illegible.  See id.

While there is some dispute, see Tr. at 13, 55, the Court will assume that Defendant accurately testified that he used crack cocaine and drank a couple beers prior to arriving

at work on December 19, 2004.[18]   See id. at 65-66, 75-76.   However, the fact that

Defendant was under the influence of drugs or alcohol does not automatically invalidate the

waiver.  See Barbour, 70 F.3d at 585; Gaddy, 894 F.2d at 1312; United States v. Taylor,

508 F.2d 761, 763 (5th Cir. 1975);[19] see also United States v. Martin, 434 F.2d 275, 278-79

(5th Cir. 1970) (finding that the fact that the defendant was under the influence of alcohol

did not invalidate the waiver because he was "not so impaired that he did not understand

what was going on nor was he incoherent"); Gibbs v. Warden of the Ga. State Penitentiary,

Hardwick, Ga., 450 F. Supp. 242, 244 (M.D. Ga. 1978), aff'd, 589 F.2d 1113 (5th Cir. 1979)

(unpublished table decision).

    An individual's impaired mental state, which may or may not be induced by drugs,

may prevent the person from knowingly and intelligently waiving his or her rights only when

it interferes with his or her ability to think clearly or understand his rights or the charges

against him or her.  See Barbour, 70 F.3d at 585; see also Taylor, 508 F.2d at 763

(concluding that drug use will only invalidate a waiver when the defendant's condition is "so

affected as to make his statement, after appropriate warnings, unreliable or involuntary").

Even if Defendant was under the influence of alcohol and crack cocaine at the time of the

---

[18]    There is, however, no evidence to support any suggestion that Defendant used crack cocaine after he reported for work on December 19, 2004.  Defendant does make such an assertion in his Memorandum, see Defendant's Memorandum at 10, and Inspector King did not find any drugs or drug paraphernalia on Defendant's person or at his work station, see Tr. at 9.

[19]    This case and all Fifth Circuit cases decided prior to September 30, 1981, are binding precedent pursuant to Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

interrogation in this case, the overwhelming evidence in the record shows that he was able to understand the nature of the rights and the consequences of abandoning them.

Defendant testified that he used crack cocaine all day prior to arriving at work and consumed a couple of beers.  See Tr. at 65-66, 75-76.  However, he could not recall the amount of crack cocaine he consumed.  See id. at 65.  He arrived at work at 8:00 p.m. and worked for approximately three hours before he was interrogated.  See id. at 7-8, 49, 66.  Thus, a number of hours passed from when Defendant ingested the crack cocaine and alcohol until he was interrogated.  During this time, the inspectors observed him, except for the brief periods of time when he was away from his machine.  See id. at 7-8, 25, 49-51.  The inspectors noted that Defendant was able to perform his job in a normal and routine manner.  See id. at 7, 43.  In addition, they recalled that Defendant did not appear to be under the influence of drugs.  See id.  Moreover, despite being addicted to crack cocaine and abusing alcohol for the past fifteen years and using crack cocaine all day and every day, Defendant was able to perform his job as a mail processor from 1990 until January of 2005.  See id. at 63-65.  The fact that Defendant was able to function normally detracts from a finding that he was not able to knowingly and intelligently waive his rights.[20]  See Gibbs, 450 F. Supp. at 245.

Defendant's interaction with the inspectors during the interrogation also undermines a finding that the waiver was invalid.  Inspector King testified that Defendant appeared to

---

[20]     There is no evidence that he ingested more crack cocaine on this night than he had on any previous night.  See Tr. at 65-66.

understand his rights and did not seem intoxicated.  <u>See</u> Tr. at 12.  In addition, Defendant

signed the waiver form and indicated to the inspectors that he understood his rights.  <u>See</u>

<u>id.</u> at 12, 35; Government's Ex. 1.  Inspector King opined that Defendant's statements were

coherent and lucid.  <u>See</u> Tr. at 14.  Defendant was able to answer questions without a long

delay.  <u>See</u> <u>id.</u> at 17-18.  Inspector Curto also recalled that Defendant appeared to

understand his rights and the waiver and that his actions did not reflect that he was under

the influence of drugs.  <u>See</u> id. at 44.  He also indicated that Defendant's statements were

coherent and lucid.  <u>See</u> id. at 45.

Moreover, Defendant provided very detailed statements on that night.  He informed

Inspector King of his drug problem and his attempts at treatment.  <u>See</u> id. at 14.  He also

told Inspector King that his actions in opening the mail were not related to his drug

addiction.  <u>See</u> id.  When Defendant was questioned regarding his activities that night, he

provided several different reasons why he was opening the mail until he finally conceded

that if the inspectors had him on videotape, then he probably did it.  <u>See</u> id. at 14-16.

In addition, despite being under the influence of drugs and alcohol, Defendant was

able to ask the inspectors for a union steward at the beginning of the interview.[21]  <u>See</u> <u>id.</u>

at 70.  He also agreed to answer Inspector King's questions, but indicated that if he

wanted to stop, he would stop. <u>See</u> <u>id.</u> at 10.  Furthermore, Defendant indicated at the end

---

[21]     The inspectors' recollection on this point differs.  They recalled that Defendant asked
if he needed a union steward.  <u>See</u> Tr. at 10, 54.

of the interview that if he was not under arrest, he would not provide his fingerprints. <u>See</u> <u>id.</u> at 18.

This testimony shows that Defendant certainly had an understanding of his rights and the drugs did not impair his ability to understand the nature of his rights and consequences of waiving them. He was not so intoxicated as to have no knowledge of the consequences of his actions or statements. Indeed, the evidence indicates that Defendant had a keen awareness of his actions on that night, especially when he denied that the opening of the mail was related to his drug problem, refused to provide his fingerprints, and offered different explanations for his actions in opening the mail. Just as the defendant in <u>United States v. Gaines</u>, the Defendant's actions at the time of his statements belie his claimed lack of capacity to understand. <u>See</u> 987 F. Supp. 1432, 1437 (S.D. Fla. 1997).

Consideration of Defendant's background also weighs in favor of finding a knowing and intelligent waiver. Defendant enlisted in the Air Force in 1970 and worked for sixteen years as a security police officer. <u>See</u> Tr. at 61-62. During this time, he advised people of their <u>Miranda</u> rights, and thus, was aware and understood those rights. <u>See</u> <u>id.</u> at 69. This testimony supports a finding that the waiver was valid.

Finally, Defendant argues that his signature on the waiver form establishes that he was too intoxicated to knowingly and intelligently waive his rights. <u>See</u> Defendant's Memorandum at 10. Defendant relies only on this evidence to show the extent of his intoxication. <u>See</u> <u>id.</u> However, there is another explanation for Defendant's irregular signature. Defendant testified that at the time of the interrogation, he was nervous,

stressed, and uptight.  <u>See</u> Tr. at 75.  Indeed, he had just been released from handcuffs when Inspector King presented the waiver form.  <u>See</u> <u>id.</u> at 29, 32.  Defendant was also visibly nervous.  <u>See</u> <u>id.</u> at 12, 36.  Therefore, the fact that Defendant's signature on the waiver form does not appear to be his normal signature does not convince the undersigned that the waiver was invalid.

In light of the foregoing, the undersigned finds that Defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.  Therefore, Defendant's statements should not be suppressed.

<u>**RECOMMENDATION**</u>

In light of the foregoing, it is hereby **RECOMMENDED**:

Defendant's Motion to Suppress Statements (Dkt. No. 57) should be **DENIED**.

**ENTERED** at Jacksonville, Florida, this 7th day of September, 2005.

_Marcia Morales Howard_

**MARCIA MORALES HOWARD**
United States Magistrate Judge

lc1

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

All Counsel of Record
Pro Se Parties